**In the Interest of R.I.S., E.T., Jr., and D.C.T., Children.**

**No. 06–03–00062–CV.**

Court of Appeals of Texas, Texarkana.

Oct. 30, 2003.

Patrice Savage, Carthage, for appellant.

Renee Gartland, Quita Russell, Assistant District Attorney, Longview, for Texas Dept. of Protective Services.

Raymond E. Rogers Jr., Longview, for Michael Patrick Story.

Myla G. Mayberry, Longview, for Ad Litem.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

MORRISS, Chief Justice.

Drugs, alcohol abuse, danger, squalor, instability, and even physical abuse controlled the environment where Tanya Trevino lived with her three children, R.I.S., E.T., Jr., and D.C.T., who were ages ten, six, and five, respectively, at the time of trial. Tanya's parental rights were terminated by the trial court, and Tanya appeals contending the evidence is factually insufficient to support the termination. We affirm.

*Standard of Review*

"Termination of parental rights is traumatic, permanent, and irrevocable. This fact has been pivotal for the United States Supreme Court. And it is to us. For this reason, any significant risk of erroneous [termination of parental rights] is unacceptable." *In re M.S.*, 115 S.W.3d 534, 549–50, 46 Tex. Sup.Ct. J. 999 (Tex. 2003). For that reason, when a parent whose parental rights have been terminated complains on appeal that the evidence is insufficient to support the termination, we use a heightened standard of appellate review. *See In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex.2002) (defining standard of review for legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex.2002) (defining standard of review for factual sufficiency).

The State's fundamental interest in parental rights termination cases is to protect the best interest of the child. TEX. FAM. CODE ANN. § 153.002 (Vernon 2002); *In re B.L.D.*, 113 S.W.3d 340, 353–54 (Tex. 2003). A court may order involuntary termination only if the court finds that: (1) a parent has committed a predicate act or omission harmful to the child, and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001 (Vernon 2002); *B.L.D.*, 113 S.W.3d at 353–54. This interest is aligned with another of the child's interests—an interest in a final decision on termination so that adoption to a stable home or return to the parents is not unduly prolonged. *M.S.*, 115 S.W.3d at 547–49.

The standard for our review in determining whether clear and convincing evidence has been provided to justify termination is whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the State's allegations were true. *See* TEX. FAM. CODE ANN. § 101.007 (Vernon 2002); *C.H.*, 89 S.W.3d at 25 (" 'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."). The Texas Supreme Court reasoned in *C.H.* that this provides a standard that "focuses on whether a reasonable jury could form a firm conviction or belief [yet] retains the deference an appellate court must have for the fact finder's role." *C.H.*, 89 S.W.3d at 26. In reaching this conclusion, the court explicitly rejected standards "that retain the traditional factual sufficiency standard while attempting to accommodate the clear-and-convincing burden of proof." *Id.; see, e.g., In re W.C.*, 56 S.W.3d 863, 868 n. 3 (Tex.App.-Houston [14th Dist.] 2001, no pet.); *Leal v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 315, 321 (Tex.App.-Austin 2000, no pet.). The court also disapproved of a test articulated in several cases which stated that a court of appeals must determine whether a reasonable trier of fact could conclude that the existence of a disputed fact is "highly probable." *C.H.*, 89 S.W.3d at 26. Under such review, we must maintain the respective constitutional roles of juries and appellate courts.

An appellate court's review must not be so rigorous that the only fact-findings that could withstand review are those

established beyond a reasonable doubt. *See Santosky*, 455 U.S. at 767–69, 102 S.Ct. 1388 (holding that "beyond reasonable doubt" standard not required in termination cases). While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.

*Id.*

■ The nonexclusive list of factors we may consider in determining whether the termination of a parent's rights is in a child's best interest includes (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976); *In re C.T.E.*, 95 S.W.3d 462 (Tex.App.-Houston [1st Dist.] 2002, pet. denied).

*The Evidence*

In this case, there was no evidence the children had expressed a preference regarding whether to live with Tanya. The evidence reflects there are emotional and physical needs of the children for both short- and long-term stability and care-giving which were not met in the living environment provided by Tanya. In her testimony, Tanya admits that she and her husband, Edward Trevino (Trevino)[1] used and sold cocaine and methamphetamine; that they had left the children, effectively, to fend for themselves for several days at a time; and that she had continued to live with a husband who was an alcohol and drug abuser, and who physically abused both Tanya and at least the oldest of the children. The evidence shows a lack of parental ability stretching over the lifetimes of the children, and an unwillingness for that entire time (except possibly for the last few months) to make any changes that would improve the situation. Plans had been put in place to assist, and programs were made available, but the testimony was that Tanya failed to take advantage of them. Evidence was introduced that Tanya was unable or unwilling to provide a stable home or placement and that the children markedly improved when removed from her care and placed in foster care. It also showed the Trevino home was unsafe and unsanitary, with transients roaming the house, food left to rot on counters, drug use and sales, and Tanya and Trevino being in self-induced alcohol or drug stupors for extended periods of time with small children present. The only excuse suggested by Tanya was that she was forced into her lifestyle by Trevino. There is evidence he was physically abusive, but the evidence also shows she made no effort to avoid the situation by taking any affirmative action. She also testified that he had injected her with drugs and that she retrieved drugs for him because she was afraid of him. Tanya no longer lives with Trevino (who is incarcerated), but has moved in with her mother and has been joined there by a new boy-

---

1. Edward Trevino has not appealed the termination of his parental rights.

friend. The State's drug screening showed she had been drug free since July 2002.

The State's evidence certainly painted an appalling picture of Tanya's home situation, both when she and the children lived with Trevino and currently. Scott Toliver, the Family Based Safety Services Specialist who had worked with the Trevino family since April 2002, testified Tanya spent a significant amount of time away from home working, leaving Trevino with the children.[2] Trevino has cirrhosis of the liver, but continued to drink alcohol in large quantities, and Toliver testified that, as Trevino lowered his alcohol intake, he shifted to use of cocaine and methamphetamine. Toliver testified that, when he visited the home, he found it typically inundated with dirty dishes, food apparently left out for days at a time, clothes, beer bottles, and cans covering the floor, cockroaches infesting it, and numerous safety hazards such as broken windows.

Toliver also testified neither Tanya nor Trevino were making any effort to comply with the service plans set up by the department. He also testified he had seen bruises on Tanya from attacks by Trevino. Toliver noted that he had found a prostitute at the home during one of his visits and that transients and multitudes of friends and acquaintances would come and go there.

At one point, on June 10, 2002, Tanya came to Toliver asking for help because she and Trevino had been injecting methamphetamine and cocaine for several days, and the children had eaten only two meals in two days. She also told Toliver that Trevino was coercing her to sell drugs for him and became angry and violent when she could not sell them.

At that point, Toliver and police officers removed the children from the house. They found Trevino with track marks on his arms and found a sawed-off shotgun in the house.[3] Toliver described all three children as being very dirty, with the two youngest wearing only underwear. At that point, all three children were placed in foster care.

A new family service plan was then designed for Tanya, which required her to undergo drug assessments and treatment, to take parenting classes and an education course on choices and consequences, to establish and keep a home for two months before any return of a child, and to budget adequately to maintain the home she established. CPS began providing services in October 2000 and took the position that Tanya had failed for almost two years thereafter to demonstrate either desire or willingness to protect her children. Toliver also testified Tanya had not shown any cooperation or made any attempt to improve her parenting skills for the two years before the children were removed.

Robert Shore, a psychologist, testified at length about the evaluations done on each of the children. He testified that R.I.S., the oldest boy, had auditory hallucinations, which was extremely unusual for a child. Shore discussed the history of domestic violence by Trevino toward both Tanya and the children, the parents' use of significant quantities of drugs in the presence of the children, the children going without food, and the total lack of structure and stability in the household. He testified that household structure and stability were critical to help a child develop the re-

---

2. Tanya testified she had been involved with a Child Protective Services investigation since 1999.

3. Trevino was convicted for possession of an illegal weapon and sentenced to two years' incarceration.

sources for self-control, that lack of these factors in the household would cause the child to get highly anxious and to develop behavior problems, emotional disturbances, and the like, and that this would also factor into R.I.S.'s aggressive behavior toward his siblings. There is also testimony from Tieraney Beall, a CPS worker with these children, that since R.I.S. has been in foster care his behavior has improved, that he no longer soils his pants and hides them, that the medication he is taking helps control his aggressive behavior and anger, and that he is making good grades in regular classes at school.

Shore testified that E.T., Jr., a boy just short of five years of age at the time he was evaluated, was developmentally behind and that he was wetting his pants and soiling himself during the day, a sign of anxiety in children who have lived in chaos. He testified E.T., Jr., while in foster care, was happy when there was plenty to eat (another sign of prior neglect), fought other children, and was uncontrolled in his behavior. Shore also testified E.T., Jr., exhibited compulsive sexual behavior, resulting from the environment from which he came, and that in a less chaotic environment, therapy would help him develop more self-control.

Shore testified that D.C.T., the youngest boy, who was just under four years of age at the time he was evaluated, was in a little better shape because of his young age, but that when he entered foster care he was stuttering badly, a sign of anxiety-as shown by the fact his stuttering had abated after three months in foster care. He also testified D.C.T. was highly resistant to going to bed at a particular time, showing the previous lack of structure in the home and D.C.T.'s resulting perception of danger and lack of predictability. As described by the psychologist,

[T]hat's how they learn safety. They learn to be safe. If they can predict what's going to happen in their environment, it's okay to live here; it's safe to be here. I feel safe. I don't have to be anxious, then. I know what's going to happen. I know I'm going to get meals. I know Mommy and Daddy aren't going to be beating each other up. I know there's not all these weird characters coming in and out of the house, and on and on.

Shore also testified he believed it was important for these children to have permanence away from their parents and pointed out on cross-examination that the fact the children had bonded to their parents did not mean those individuals should continue to parent.

Tanya has not attempted to dispute any of the testimony about her past activities and failures to address problems in the household. She instead focuses her arguments on personal injuries she sustained during the current service plan. Tanya argues the State had not done all it could to reunite the family because it had terminated her rights while she was unable to work due to her broken legs and was living with her mother, and thus was unable to afford the psychological evaluation or counseling. The evidence shows that she was hit by a car on August 20, 2002, and that the accident broke both her legs and left her unable to actively participate in services. The evidence shows Tanya (1) completed her parenting classes and East Texas Council on Alcoholism and Drug Abuse, (2) passed drug screening since July 2002, and (3) attended visitations. The State had required psychological evaluations and counseling services, but had declined to pay for them. Because of her inability to walk, however, Tanya was unable to work, and there is some evidence she was therefore unable to afford the

services. It is not clear from the evidence what occurred after her legs healed, or the full extent of the damage done in the accident. Eight months elapsed between the date of the accident and the hearing, but it does not appear Tanya had made any continuing effort to get the counseling or psychological services during that time. There is also testimony Tanya had been given the name of a psychological service that charged only according to ability to pay.

There is also testimony Tanya had not been up to date with the service plan before the accident, but had been able to complete some of it since the accident. At the time of the hearing, she was living with her mother, and a boyfriend had also moved in with them. Bertile Johnson, a family worker for CPS, testified Johnson had visited that home and found it to be an environment that was neither safe nor sanitary for children. Photographs were introduced into evidence showing the interior of the house with trash piled against the walls, open food containers crowding every square inch of counter and table space, and floors covered with various types of debris. Johnson likewise concluded there was no demonstrated significant change that would permit either the father or mother to effectively parent their children.

*Similar Cases*

■ The question before this Court is whether the evidence, as set out above, was such as to allow the trial court as factfinder to reasonably form a firm belief or conviction about the truth of the State's allegations. Counsel has directed us to two cases in which appellate courts, on analogous facts, concluded that the evidence in those cases did not support termination.

*In re K.C.M.*, 4 S.W.3d 392 (Tex.App.-Houston [1st Dist.] 1999, pet. denied), involved a mother who had a long history of drug abuse, prostitution, and an exhibited unwillingness to care for her young son. When she was sent to jail, however, she began a change that the appellate court found compelling. The opinion lists nine activities in which she had engaged while in jail, over a period of ten months, that the court concluded showed her desire to change her life upon release. *Id.* at 399. In light of the uncontroverted evidence of the progress she had made while in jail, that court concluded that a "firm belief or conviction" that the best interest of the child required termination could not be fairly reached.

*C.H.*, 89 S.W.3d 17 (Tex.2002), *reversing,* 25 S.W.3d 38 (Tex.App.-El Paso 2000), contains the Texas Supreme Court's explanation of the standard that should be employed by appellate courts in reviewing evidentiary sufficiency in parental rights termination proceedings. The El Paso Court of Appeals had found the evidence insufficient to support a finding that termination was in the child's best interest. The Texas Supreme Court reversed the El Paso court because the El Paso court disregarded much of the evidence supporting the finding that termination was in the child's best interest (mainly involving the father's past neglect and his failures to effectively parent either that child or an older one by his wife) and because the court of appeals failed to explain clearly why it concluded a reasonable fact-finder could not form a "firm conviction or belief from all the evidence" that termination of the father's rights was in the child's best interest. *Id.* at 29.[4]

4. The El Paso court had determined that the evidence was insufficient to support termination of either the mother or the father.

Between the time of its opinion and the Texas Supreme Court's ruling, however, the mother relinquished her parental rights; thus, only

*Conclusion*

In this case, we begin with the underpinning of past behavior by Tanya that shows, that for several years, despite the State's attempts to intervene, she did not develop or show the desire to act as a parent for the children. The evidence is, in fact, to the contrary. It appears the destructive activities accelerated as time went on, reaching their worst with a multi-day cocaine binge-with the three children in the house.

We recognize Tanya's efforts to get the children out of the house and to seek help at that point, weigh in her favor. Her belated, but ultimately successful, attempt to complete parenting classes, and the evidence that she did stay drug free from July 2002 until April 2003, also weigh in her favor.

Against this, however, lies the extensive evidence of her past activities and her failure to attempt to meet the remaining requirements of psychological therapy and counseling, despite being informed of how she might do so. Into this we insert her injuries from a car accident-injuries occurring eight months before the trial court's hearing. The condition of her current residence into which the children would be placed also weighs against Tanya, because of the squalor and lack of structure in that house.

There is evidence on both sides of this issue. The question is whether, from all of the evidence, the trial court as fact-finder could reasonably form a firm belief or conviction about the truth of the State's allegations. Based on Tanya's history, her only partial compliance with the service plans, the condition of the children at the time they were taken into foster care, their very substantial improvements in all areas since being removed, and Tanya's subse-

quent home situation, we must conclude that the trial court in this situation could reasonably form the required firm belief or conviction about the truth of the State's allegations and that it was therefore in the best interests of the children to terminate Tanya's parental rights.

We affirm the judgment.

the father's claims remained before the Supreme Court.