In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-04-00131-CV
______________________________


 
IN THE INTEREST OF E.J.P., A CHILD
 


                                              

On Appeal from the County Court at Law
Bowie County, Texas
Trial Court No. 03C0179-CCL


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Memorandum Opinion by Justice Carter


MEMORANDUM OPINION

            James Peters and Jamie Peters appeal from the termination of their parental rights to E.J.P.,
a child now three and one half years old. The child, at the age of thirteen months, was taken into
custody in February 2003 by the Texas Department of Protective and Regulatory Services (DPRS).
            The Peters argue that the trial court erred in terminating their parental rights because the
evidence was legally and factually insufficient to justify termination and erred in finding that
termination was in the best interest of the child. 
I.         Factual Background
            The inception for the filing of this particular case occurred in February 2003, when James,
while walking down the street carrying E.J.P. on a cold, wet day, was arrested after James had
attempted to use the telephone at a stranger's house. The occupant of the house called police, who
determined James was acting extremely strangely. James was arrested for public intoxication. The
police found James talking wildly and saying his wife had put something in his drink. The deputy
then contacted Jamie, whom he described as appearing to be under the influence of a narcotic. When
Jamie refused to allow the deputy to enter her house, he called DPRS to take custody of the child. 
James testified his actions were caused by his use of painkillers after dental surgery, together with
a dose of Nyquil, which were set out for him by his wife. A drug test of James conducted a few days
later showed both methamphetamine and marihuana in his system. 
            DPRS was already familiar with the Peterses. E.J.P. was born December 27, 2001. In
November 2001, an incident occurred at the Peterses' home that caused both James and Jamie to be
arrested. According to Jamie, she allowed a friend to come to her house, ostensibly for the purpose
of taking a shower and doing some laundry. Instead, the friend set up a "meth lab" in the house,
which police raided. The friend, Jamie, and James were arrested. Both Jamie and James denied any
knowledge of the "meth lab" and were never prosecuted. However, both were arrested, and Jamie
was released shortly before giving birth to E.J.P., while James remained in jail for several more
months. 
            Jamie acknowledged she is a drug addict. She testified she had smoked marihuana for over
thirty years and had used methamphetamine on a weekly basis. She believes she now has the drug
problem under control. Recent history confirms the drug problem. In February 2001, she was
convicted of possession of marihuana and placed on community supervision. One of the conditions
of her supervision was that she submit to drug testing. A motion to revoke her community
supervision was filed. At the revocation hearing, Jamie pled true to the use of drugs and that the
drug testings in March and April 2001 were positive for methamphetamine and positive for cocaine
October 18, 2001. She also had positive drug tests for marihuana in April and May 2001. As a
result, her community supervision was revoked in February 2002, and she was ordered to serve
ninety days in jail. These results show that Jamie was using illegal drugs during the time she was
pregnant with E.J.P. She testified she knew the drugs could be harmful to the child. It was
uncontested that E.J.P. had drugs in his system when he was born. James testified that Jamie told
him differing stories regarding how this might have occurred, including that, while she was in labor,
someone had given her a "joint" with methamphetamine in it. It appears that DPRS had previously
taken custody of E.J.P. shortly after his birth, and he was returned to James in May 2002 after he got
out of jail for the "meth lab" incident and while Jamie was in a drug rehabilitation center. Then, in
February 2003, this incident (James taking E.J.P. from the home while appearing intoxicated)
occurred, causing DPRS to again take custody of E.J.P.
            James also had a history of drug abuse, although his drug abuse primarily occurred many
years ago. He acknowledged that, during the 1960s and 1970s, he used a long list of controlled
substances. He entered a drug rehabilitation program in 1977, but shortly after completion, he was
sent to prison for possession of phencyclidine and for forgery. James testified he had not used drugs
for many years. 
II.       Standard of Review
            The standard of review in parental rights' termination proceedings is clear and convincing
evidence. Tex. Fam. Code Ann. § 161.001 (Vernon 2002); In re J.F.C., 96 S.W.3d 256, 263 (Tex.
2002). The evidence is clear and convincing when the proof is such that it produces in the mind of
the trier of fact a firm belief or conviction of the truth of the allegations sought to be established by
the State. In re C.H., 89 S.W.3d 17, 25–26 (Tex. 2002). 
            a.         Legal Sufficiency
            In reviewing the legal sufficiency of the evidence, we view all the evidence in a light most
favorable to the finding to determine whether a reasonable trier of fact could have formed a firm
belief or conviction that its finding was true. J.F.C., 96 S.W.3d at 266; C.H., 89 S.W.3d at 25. 
Looking at the evidence in the light most favorable to the judgment means we must assume that the
fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. A
corollary to this requirement is that a court should disregard all evidence that a reasonable fact-finder
could have disbelieved or found to have been incredible. J.F.C., 96 S.W.3d at 266.
            b.        Factual Sufficiency
            When reviewing a factual sufficiency challenge to a parental rights' termination, we consider
the evidence the fact-finder could reasonably have found to be clear and convincing. See id.; C.H.,
89 S.W.3d at 25–26. In applying this standard to a trial court's findings, we ask whether there was
sufficient evidence presented to produce in the mind of a rational fact-finder a firm belief or
conviction as to the truth of the allegations sought to be established. In re N.R., 101 S.W.3d 771,
774 (Tex. App.—Texarkana 2003, no pet.).
III.      Requirements for Termination
            The State's fundamental interest in parental rights' termination cases is to protect the best
interest of the child. Tex. Fam. Code Ann. § 153.002 (Vernon 2002); In re B.L.D., 113 S.W.3d
340, 353–54 (Tex. 2003). A court may order involuntary termination only if the court finds that: 
(1) a parent has committed a predicate act or omission harmful to the child, and (2) termination is
in the best interest of the child. Tex. Fam. Code Ann. § 161.001; B.L.D., 113 S.W.3d at 353–54. 
This interest is aligned with another of the child's interests—an interest in a final decision on
termination so that adoption to a stable home or return to the parents is not unduly prolonged. In re
M.S., 115 S.W.3d 534, 547–49 (Tex. 2003); In re R.I.S., 120 S.W.3d 502, 503 (Tex.
App.—Texarkana 2003, no pet.).
            a.         Pattern of Parents' Conduct
            James and Jamie take the position that DPRS sought to terminate based on the February 2003
incident resulting in the arrest of James and DPRS taking custody of E.J.P. They therefore focus the
first portion of their insufficiency argument on the situation presented when James was arrested. It
is argued that the facts show only that James was arrested by police one Sunday morning, while
walking down a street in a cold rain with the infant wrapped in a blanket. They acknowledge that
James was acting strangely, but argue that the reason for his behavior was the prescribed narcotic
medication he was using following dental surgery, mixed with an alcohol-based sleep aid (Nyquil). 
It is true that, even though James was arrested for public intoxication, no charges were ever pursued. 
            We recognize this case is not restricted to a single act by either party, although it is clear this
event triggered this proceeding. However, the DPRS' allegations seeking termination concern much
more than this one event, as did the evidence presented at trial. In its findings, the trial court
specified Section 161.001(1)(D), (E), (N), and (O) of the Texas Family Code as the grounds for
termination for both parents and additionally specified Section (P) as to Jamie. Only one statutory
ground is required to terminate parental rights. In re N.R., 101 S.W.3d 771 (Tex. App.—Texarkana
2003, no pet.). Having found Section 161.001(1)(E) to be dispositive, we will discuss only that
issue.
            b.        Endangered by Parents' Conduct
            Section 161.001(1)(E) of the Texas Family Code addresses whether the child was endangered
and focuses exclusively on the parent's conduct. Under that section, proof that the parent's course
of conduct endangered the child's physical or emotional well-being is sufficient. Tex. Dep't of
Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987); In re S.F., 141 S.W.3d 774, 777 (Tex.
App.—Texarkana 2004, no pet.); In re S.H.A., 728 S.W.2d 73, 83–84 (Tex. App.—Dallas 1987, writ
ref'd n.r.e.). This conduct must be more than a threat of a metaphysical injury of the possible ill
effects of a less than ideal family environment. However, the child does not need to suffer actual
physical injury to constitute endangerment. Boyd, 727 S.W.2d at 533. Rather, endangerment means
to expose to loss or injury; to jeopardize. Id. 
                        1.         Jamie
            Has Jamie engaged in conduct that endangered E.J.P.? Jamie used drugs when she was
pregnant with E.J.P., which resulted in drugs being in his system at birth. The use of drugs during
pregnancy may be conduct which endangers the physical or emotional well-being of the child. 
Edwards v. Tex. Dep't of Protective & Regulatory Servs., 946 S.W.2d 130, 138 (Tex. App.—El Paso
1997, no writ) (citing Dupree v. Tex. Dep't of Protective & Regulatory Servs., 907 S.W.2d 81, 84
(Tex. App.—Dallas 1995, no writ)). Additionally, one month before E.J.P. was born, a friend of
Jamie came to the Peterses' home and constructed a "meth lab." Jamie testified she was completely
unaware of the friend's intention to install a "meth lab" in her home. It is further true Jamie was not
prosecuted for the criminal offense. However, the trial court is allowed to judge the credibility of
witnesses and believe or disbelieve their testimony. Jamie's explanation was that a friend came to
her house and, without Jamie's knowledge, set up a "meth lab" while she was present. Apparently,
during this time, the police obtained information that the "meth lab" was to be established there,
raided it, and arrested Jamie, James, and the friend. The trial court could have disbelieved Jamie's
explanation that she was completely duped. The records presented into evidence showed Jamie was
convicted of possession of marihuana and, while on community supervision, she tested positive for
drug usage several times. Some of these positive tests occurred during the time Jamie was pregnant
with E.J.P. As a result of her drug usage, Jamie was required to serve ninety days in jail. The drug
test performed in February 2003 was positive for marihuana, but a later test in May 2003 was
negative. The record establishes she took drugs while she was pregnant. At one time, Jamie
explained that, during labor, someone had given her a "joint" laced with methamphetamine. She also
testified that another test was positive because she accidentally ingested marihuana from brownies
her neighbor prepared. These explanations were subject to a credibility analysis, and the trial court
was not required to believe the explanations. We find the evidence clearly and convincingly
supports a finding that Jamie's conduct endangered E.J.P. 
                        2.         James
            Most of the evidence of James' drug usage is not as recent. He was heavily involved in drug
usage during the 1960s and 1970s and completed a drug rehabilitation program. However, the
incident that triggered the filing of this case is not so easily explained. James and Jamie swear that
James did not take any drugs, other than prescription medications due to oral surgery, and Nyquil,
on the day of the incident. The explanation was contradicted by a drug test taken a few days after
he was arrested, which was positive for methamphetamine and marihuana. Clearly, James' actions
on the day he took his son out in the cold, wet weather were unusual and erratic. However, we do
not decide a case concerning termination of parental rights based on an isolated event. More
important is a pattern of conduct. Other factors deserve our attention.
            James is a long-haul truck driver, who necessarily left E.J.P. with Jamie. There is evidence
she irregularly engaged in a much wider range of inappropriate drug-related behavior than did James. 
James was aware that E.J.P. was born with drugs in his system, that Jamie had several positive drug
tests for marihuana, methamphetamine, and cocaine, that a "meth lab" was set up in their house by
her friend, and that Jamie had been required to serve ninety days in jail for violating the terms of
community supervision that she not consume any drugs. One parent's drug-related endangerment
of the child may be imputed to the other parent. Edwards, 946 S.W.2d at 138 (citing In re Guillory,
618 S.W.2d 948, 951 (Tex. Civ. App.—Houston [1st Dist.] 1981, no writ)). This evidence of
Jamie's past behavior and apparent inability to abstain from the use of unlawful drugs is evidence
from which the trial court could conclude she had engaged in conduct that endangered the physical
or emotional well-being of the child. It is also evidence that James, who knew of such conduct, had
knowingly left the child with Jamie, who continually engaged in the use of unlawful drugs. There
is further evidence James used drugs, as shown by his unusual behavior with E.J.P., which
precipitated the police being called and which was verified by a drug test. We find this evidence
sufficient under the clear and convincing standard to support the trial court's order of termination as
to James. 
IV.      Best Interest of the Child
            James and Jamie also contend there is insufficient evidence to support the conclusion that
termination was in the best interest of the child. That portion of our review proceeds from the
policy-based presumption that the best interest of a child is usually served by preserving the
parent-child relationship. In re G.M., 596 S.W.2d 846, 847 (Tex. 1980); see Wiley v. Spratlan, 543
S.W.2d 349, 352 (Tex. 1976). In determining the child's best interest, the fact-finder may consider
the current and future physical and emotional needs of the child, the current and future physical and
emotional danger the child may confront with his or her parent, and the parental abilities of the
individual seeking custody. The case of Holley v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976), sets
out the following list of nonexclusive factors to consider when determining the best interest of a
child: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the
future; (3) the emotional and physical danger to the child now and in the future; (4) the parental
abilities of the individuals seeking custody; (5) the programs available to assist these individuals to
promote the best interest of the child; (6) the plans for the child by these individuals or by the agency
seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the
parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any
excuse for the acts or omissions of the parent. 
            Factors 8 and 9 have been fully discussed previously. There is no evidence concerning
factors 1 and 2. We will discuss the issues that have the most relevance in this case: factors 3, 4,
5, 6, and 7. 
            Heather Huckabee, the DPRS representative, and Kim Griffin, the Court-Appointed Special
Advocate (CASA) worker, each testified that she believed termination was in the best interest of the
child. 
            Factor 3—The emotional and physical danger to the child now and in the future. One
difficulty is the ongoing drug problem of Jamie, coupled with the absence of James due to his job,
which would result in some lack of ability to assist Jamie with her drug problems. Additionally, for
whatever reason, the facts are that E.J.P. has lived with his parents for only seven months of his now
forty-four-month life. Certainly, an emotional strain would be caused if the child were required to
leave the home he has known for more than two and one half years of his life. 
            Factor 4—The parental abilities of the individuals seeking custody. Very little evidence was
presented on this issue as to the parenting skills of James and Jamie. The previous section discussed
drug usage, which impacts negatively on the ability of any parent to care for his or her child. 
            Factor 5—The programs available to assist these individuals to promote the best interest of
the child. One of the DPRS' complaints was that James and Jamie did not cooperate with DPRS
concerning the programs offered to them. James and Jamie and the DPRS testimony conflicted on
whether the Peterses completed many of the programs offered—e.g., counseling—Huckabee testified
that they had not completed counseling, but Jamie testified she had attended as required. Parenting
classes—Huckabee thought Jamie had not completed the classes, but Jamie said DPRS had decided
not to require the classes because she had previously taken them. Visitation—James did not see the
child for nine months, and there was disagreement on whether scheduling changes caused the lack
of visitation. Overall, the programs offered to the Peterses did not appear to accomplish the
objective sought. 
            Factor 6—The plans for the child by these individuals or by the agency seeking custody. 
E.J.P.'s foster parents intervened in this case and are seeking custody and ultimately the opportunity
to adopt E.J.P. Griffin, the CASA worker assigned to consider only the best interest of the child,
testified the child's best interest would be the termination of the parental rights to allow the child to
establish a permanent home. Huckabee testified she had no concerns about the parenting ability of
the foster family. That a family wishes to adopt the child and assume the parental responsibilities
may also be considered in determining the best interest of the child. See In re B.B., 971 S.W.2d 160,
169–70 (Tex. App.—Beaumont 1998, pet. denied); Trevino v. Tex. Dep't of Protective & Regulatory
Servs., 893 S.W.2d 243, 252 (Tex. App.—Austin 1995, no writ). E.J.P. has lived with his foster
parents since February 2003. According to Griffin, E.J.P. had, at the time of the trial, been in foster
care for twenty-four of the thirty-one months of his life.
            Factor 7—The stability of the home or proposed placement. Another problem is the current
lack of a home. For the last four months, Jamie had accompanied James on his long-haul truck
driving trips and they lived in the truck. James testified that he had a place to live in Fairlawn, Ohio,
and that Jamie lived in Texarkana, but he did not know her address. He testified they planned to
move near James' father's home in Ohio. James' father had intervened in this case requesting that
he be granted custody of E.J.P. A social study was ordered concerning his home, and the
recommendation was that such a placement should not occur for at least six months unless
significant work was done by Mr. and Mrs. Peters (James' father and stepmother) to establish a bond
with the child. It is also significant that, for a period of at least nine months, James did not visit
E.J.P. 
V.        Conclusion
            There is evidence of long-term drug use and of Jamie's repeated return to the use of drugs. 
There is evidence that James left E.J.P. in Jamie's care, despite knowing about her use of drugs. 
There is evidence that Jamie was on drugs when E.J.P. was born and that E.J.P. had drugs in his
system at birth. James did not visit E.J.P. for almost nine months. The record shows that James and
Jamie blamed DPRS for their troubles and demonstrates that they were inconsistent in their attempts
to correct the problems that endangered the child's well-being. 
            Under these facts, we conclude that there is clear and convincing evidence to support the
termination and also conclude that termination was in the best interest of the child.
            We affirm the judgment.
 

                                                                        Jack Carter
                                                                        Justice

 
Date Submitted:          August 2, 2005
Date Decided:             September 7, 2005